IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

———————————————————————————————————————

LARRY MARSHALL,

      Plaintiff,

vs.                                          No. 1:08-cv-01159

DECATUR COUNTY GENERAL
HOSPITAL, A CORPORATION,
AND JASON SCOTT, AN INDIVIDUAL

      Defendants.

———————————————————————————————————————

## ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING WITHOUT PREJUDICE PLAINTIFF'S STATE LAW CLAIM

———————————————————————————————————————

Before the Court are two dispositive motions: Defendants Jason Scott's ("Scott") (Docket Entry ("D.E.") No. 25) and Decatur County General Hospital's ("DCGH") Motions for Summary Judgment, pursuant to Rule 56, Federal Rules of Civil Procedure (D.E. No. 27). For the reasons hereinafter stated, the Court **GRANTS** both Defendants' Motions as to Plaintiff's First Amendment retaliation claim and **DISMISSES WITHOUT PREJUDICE** Plaintiff's remaining state law claim.

FACTUAL BACKGROUND

Plaintiff, Larry Marshall ("Marshall" or "Plaintiff") was the Director of the Emergency Medical Service ("EMS") at DCGH from 1976 until it terminated his employment on June 5, 2008. (D.E. No. 28, Marshall Deposition, pp. 17, 54.) Scott is the Mayor of Decatur County, Tennessee, which position he has held since 2006. (D.E. No. 25, Scott's Statement of Undisputed

Facts, ¶ 7.) DCGH is located in Decatur County, but operates independently from the county government with its own Board of Trustees, charter, and finances. (Id. at ¶ 8.) When he was terminated, Plaintiff's supervisor in his EMS Director position was the current DCGH Administrator, Norene Pumphrey ("Pumphrey"). (Id. at ¶ 2.) Pumphrey's immediate predecessor was John Crawford, the Interim Administrator ("Crawford"). (Id. at ¶ 17.)

According to Marshall, on several occasions after Scott was elected Mayor, he made comments that were critical of both Scott and other officials in Decatur County government. (D.E. No. 17, Amended Complaint, ¶ 7; *see* D.E. No. 28, Marshall Deposition, pp. 70-81.) Most of Plaintiff's criticisms seem to have been in response to Scott's appointment of Kevin Cagle as the Decatur County Emergency Management Director. (D.E. No. 28, Marshall Deposition, pp. 72, 78-80.) Marshall also stated that he made comments critical of Scott's "taking up with [his] secretary," but that his "main" criticism concerned the appointment of Cagle. (Id. at pp. 72-73.)

In August of 2007, Scott contacted Crawford, who at that time was the Interim Administrator at DCGH, and informed Crawford "about comments that Larry Marshall had made publicly to persons unknown, indicating that one of the Decatur County Commissioners who was running for re-election was incompetent." (D.E. No. 25, Crawford Declaration, ¶ 4.)[1] During the course of this call, Scott allegedly told Crawford that the County Commissioner to whom Marshall had referred was pressuring the Mayor to have Marshall terminated. (Id. at ¶ 5.) That same day, Crawford also received a call from an unnamed Decatur County Commissioner who told Crawford that Marshall had publicly called him, the Commissioner, incompetent. (Id. at

---

[1]     Both Defendants adamantly deny that any such conversation between Scott and Crawford ever occurred. (D.E. No. 27-2 DCGH SJ Motion, p. 11; D.E. No. 25-2, Scott SJ Motion, p. 12.) Defendants accept, however, that the Court must resolve all factual disputes in favor of the Plaintiff at the summary judgment stage, and as a result, are willing to concede for purposes of these motions only that the alleged "Crawford-Scott conversation" took place. (Id.)

¶ 7.) Crawford made clear that neither Scott nor the unnamed Commissioner directly asked Crawford to take any action with respect to Marshall's employment. (Id. at ¶¶ 6-7.) Later that day, Crawford offered Marshall some "friendly advice," telling Marshall that he "had not made friends by public politicking." (Id. at ¶ 8.) However, Crawford never took any adverse employment action against Marshall, nor did he remember informing his successor, Pumphrey, about either of these alleged phone calls. (Id. ¶¶ 9-14.) Moreover, although Plaintiff claims to have voiced his criticisms to several people (D.E. No. 28, Marshall Deposition, pp. 78-80), he too was unaware of any situation in which any of the people to whom he spoke communicated his comments to Pumphrey. (Id. at pp. 108-109.)

Several months later, DCGH fired Marshall from his position as EMS Director. (D.E. No. 17, Amended Complaint, ¶ 9.) Plaintiff contends that his termination was in retaliation for his alleged criticism of Decatur County government officials, including Scott, and that Scott, through his influence on Pumphrey, personally procured Marshall's termination. (Id. ¶¶ 8-10.) Conversely, DCGH and Scott insist that Plaintiff's firing was due entirely to, *inter alia*: his "poor long term performance"; the "quality of the DCGH EMS"; the weakened relationship between DCGH and various regulatory agencies; Plaintiff's apparent lack of support from his coworkers, manifested in the form of comments in an employee survey; and the DCGH EMS's poor relationship with the hospital community. (D.E. No. 25-2, Scott SJ Motion, p. 2.) Marshall responds to these contentions by averring that they are merely pretextual, meant to hide the true motivation for his termination—which was retaliation against him for the exercise of his First Amendment rights. (D.E. No. 17, Amended Complaint, ¶¶ 9-10.)

Plaintiff also alleges that Scott committed the tort of intentional interference with an employment relationship, and that DCGH's actions give rise to a common law cause of action

for retaliatory discharge. The latter is not at issue here, however, because Plaintiff claimed retaliatory discharge only as an alternative pleading in the event DCGH were to argue that it is "not a government employer subject to liability under Section 1983." (Id. at ¶ 11.) DCGH, in its Motion for Summary Judgment, admits that it is such an entity subject to Section 1983 liability, and as a result, Plaintiff, in his response to DCGH's motion, concedes that "his common law claim [against DCGH] is inapplicable to the case at bar." (D.E. No. 27-2 DCGH SJ Motion, p. 14; D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 18.) Therefore, the Court will not consider Plaintiff's retaliatory discharge claim against DCGH.

STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that

> judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). When the motion is supported by documentary proof, such as depositions and affidavits, the nonmoving party may not rest on the pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; *see also* Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998). It is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror

4

could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).
Summary judgment must be entered "against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's case, and on which that party will
bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this Circuit, "this requires the
nonmoving party to 'put up or shut up' [on] the critical issues of [an] asserted cause[] of action."
Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C.
Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make
credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir.
1994).

## ANALYSIS

### The First Amendment and Section 1983

Section 1983 imposes civil liability on every person "who, under color of any statute,
ordinance, regulation, custom, or usage, of any State" causes the "deprivation of any rights,
privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. To prevail on
such a claim, a plaintiff must establish "(1) that there was the deprivation of a right secured by
the Constitution and (2) that the deprivation was caused by a person acting under color of state
law." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is
not the source of any substantive right, but merely provides a method for vindicating federal
rights elsewhere conferred." Humes v. Gilless, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001)
(citing Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443
(1989)). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of
unconstitutional conduct by persons acting under color of state law. Some factual basis for such

claims must be set forth in the pleadings." Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986).

When, as here, a plaintiff alleges that a government official has retaliated against him for exercising his First Amendment rights, the second element of the Section 1983 prima facie case—that the deprivation was caused by a person acting under color of state law—is further broken down into three sub-elements: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." Meizbov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005) (citing Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

In this case, neither Defendant disputes that Marshall can establish the first two elements of the prima facie case—that his speech, if it occurred, would be protected, and that he suffered an adverse employment action when he was terminated. (D.E. No. 27-2, DCGH SJ Motion, p. 9; D.E. No. 25-2, Scott SJ Motion, p. 6.) However, both Defendants argue that Plaintiff has not demonstrated the requisite causal connection between his alleged speech and his subsequent termination. Scott avers that the "undisputed evidence demonstrates . . . that [he] lacked control over the adverse employment action . . . and that the adverse employment action was not a result of Plaintiff's protected conduct." (D.E. No. 25-2, Scott SJ Motion, p. 6.) Similarly, DCGH argues that "the sole decisionmaker, Ms. Pumphrey, was not even aware of [Plaintiff's] political speech," and that "DCGH . . . would have terminated Marshall's employment based on . . . poor performance . . . even if it had been aware of his criticisms of Mayor Scott or Decatur County government, which it was not." (D.E. No. 27-2, DCGH SJ Motion, p. 9.) Because the Defendants' claims are interrelated, insofar as both make essentially the same arguments about

Plaintiff's failure to demonstrate a causal link, the Court will address their contentions together.

The Defendants argue that they are entitled to summary judgment because of Plaintiff's failure to prove the causation element of his First Amendment retaliation claim, which failure is threefold: (A) Scott had no authority or control over Marshall's employment; (B) Pumphrey herself was the sole decisionmaker with regard to his termination, and she was not influenced either by Scott or by Plaintiff's alleged criticisms of Decatur County officials; and (C) Plaintiff's poor job performance was the sole impetus for his termination, his alleged criticisms of Decatur County officials notwithstanding. (D.E. No. 25-2, Scott SJ Motion, pp. 5-10; D.E. No. 27-2, DCGH SJ Motion, pp. 9-14.) After reviewing the record, the Court agrees with all of these contentions and will address each in turn.

A. Scott Had No Authority With Regard to Marshall's Employment Status

DCGH is a "separate and distinct entity from Decatur County," handles "its' [sic] own payroll [and] personnel," and is governed by its own board of directors. (D.E. No. 25, Scott's Statement of Undisputed Facts, ¶ 8.) Marshall does not dispute these facts, nor does he proffer any evidence to support his claim that Scott procured or influenced his termination. Instead, Plaintiff has offered up an "impeachment" theory, the essence of which is this: because of the aforementioned factual dispute between Crawford and Plaintiff as to the occurrence of the "Crawford-Scott conversation" (*see supra*, footnote 1), all of Scott's testimony and allegations are "soundly impeached," such that a reasonable trier of fact would be justified in doubting everything Scott has ever said regarding this case. (D.E. No. 28, Plaintiff's Response to Scott SJ Motion, pp. 4-7, 13.) In making this contention, Plaintiff cites the ancient interpretive maxim, *falsus in uno falsus in omnibus*—"every thing is corrupt that comes from a corrupted source." U.S. v. Castillero, 67 U.S. 17, 64, 2 Black 17, 17 L. Ed. 360 (1862). As a result, Marshall

maintains that there is no reason to believe Scott when he says that he had no control over

Plaintiff's continued employment or lack thereof. (D.E. No. 28, Plaintiff's Response to Scott SJ

Motion, pp. 4-7, 13.)

Notwithstanding the fact that Plaintiff does not attempt to deny Scott's lack of

employment authority, his position misstates both the facts and the law. To be sure,

Plaintiff/Crawford and Scott *disagree* as to whether the alleged "Crawford-Scott conversation"

ever took place, but it does not follow that the end result of such a dispute is the wholesale

"impeachment" of one disagreeing party's entire testimony. The mere fact that one's adversary

takes a conflicting position does not justify his being labeled untruthful. *See, e.g.,* <u>Alaska v. U.S.</u>,

545 U.S. 75, 102, 125 S. Ct. 2137, 162 L. Ed. 2d 57 (2005) (noting that a party's mere

disagreement with a source of information, without more, does not "suffice to impeach its

validity"). Even if Plaintiff's argument were grounded in the facts, the law on summary

judgment is not so draconian.

While it is true, as Plaintiff contends, that factual disputes must be submitted to the jury

for determination, "the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242

247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202, (1986) (emphasis in original). Unjustified

assumptions do not create a genuine issue of material fact, especially where, as here, the Plaintiff

has offered no evidence beyond his own conclusory allegations of Scott's duplicity to

substantiate his claim that Scott was complicit in his termination. "Conclusory allegations . . . are

insufficient to withstand a motion for summary judgment." <u>Young v. State Farm Mut. Auto. Ins.</u>

<u>Co.</u>, 868 F. Supp. 937, 945 (W.D. Tenn. 1994) (citing <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577,

585 (6th Cir. 1992)). In <u>Young</u>, the court stated that "Plaintiff's evidence essentially amounts to her personal belief . . . that she was discriminated against." <u>Id</u>. "[R]umors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim . . . as a matter of law." <u>Mitchell</u>, 964 F.2d at 585. Thus, a "plaintiff must point to some factual support in the record beyond her . . . allegations . . .." <u>Young</u>, 868 F. Supp. At 946 (citing <u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293, 1295 (7th Cir. 1993) (self-serving affidavits and depositions without factual support in the record, standing alone, will not defeat a motion for summary judgment) (internal citation omitted)).

In support of his impeachment theory, Marshall refers to two cases, <u>Allen v. Chicago Transit Auth.</u>, 317 F.3d 696 (7th Cir. 2003), and an Order Denying Defendant's Motion for Judgment as a Matter of Law in <u>Cunningham v. Black & Decker</u>, No. 05-1297-T-An (W.D. Tenn. December 7, 2007) for the proposition that "when a witness is contradicted on material matters in an employment case, his or her credibility becomes an issue for the jury and summary judgment is not appropriate." However, neither of these cases offers the level of support that Plaintiff claims. In <u>Allen</u>, a race discrimination case, the Seventh Circuit did, in fact, hold that "[w]hen a witness repeatedly contradicts himself under oath on material matters, and contradicts as well documentary evidence likely to be accurate . . . the witness's credibility becomes an issue for the jury; it cannot be resolved in a summary judgment proceeding." <u>Allen</u>, 317 F.3d at 699-700 (internal citations omitted). However, <u>Allen</u> is factually distinguishable from the case at bar. First, there were several instances in which statements made by the defendants in <u>Allen</u> directly contradicted their own prior sworn testimony—"It is not even clear what it would mean to say that the district court was entitled to treat [the defendant's] testimony as gospel truth—does this mean that Allen's absences played a role in [his rival's] promotion, or played no role?

[Defendant] said both things under oath." Id. at 700. Here, there is no such similar contradictory evidence. There is only a factual disagreement between Scott and Crawford as to whether the alleged conversation ever took place, but there is not the circumstance of one party repeatedly contradicting *his own* prior testimony. Moreover, Allen is distinguishable from the present case because the defendants' testimony in Allen was contradicted not only by their own prior testimony, but also by substantial documentary evidence. Id. Conversely, Marshall can point to no such evidence, or indeed, to any evidence that contradicts Scott's testimony, other than Crawford's affidavit. Thus, Allen is of little assistance to Plaintiff.

Nor is the order in Cunningham v. Black & Decker helpful to Marshall. In that case, Cunningham sued her employer for terminating her, allegedly in retaliation for filing a worker's compensation claim. No. 05-1297-T-An at 1. Cunningham, like Allen, is factually distinguishable. First, the plaintiff in Cunningham was terminated a mere sixteen days after reporting her worker's compensation claim, whereas in the instant case, several months passed between Marshall's alleged speech and his subsequent termination: Crawford's declaration states that his conversations with both Scott and Plaintiff took place in August of 2007, but Plaintiff was not fired until June of 2008, ten months later. Id. at 4-5; D.E. No. 27, Crawford Declaration, pp. 1-2; D.E. No. 27, DCGH Statement of Undisputed Facts, ¶¶ 10-11, 25. Even were there not such a large gap in the time period between Marshall's alleged speech and his termination, he nevertheless would not benefit from Cunningham. That ruling cautioned that "temporal proximity alone, in the absence of other evidence, is generally not sufficient to support a finding of causal connection," but it found that Cunningham had presented "other evidence giving rise to an inference of a causal connection, such as the failure to adhere to established company policy and discriminatory treatment of plaintiff when compared to similarly situated employees."

Cunningham, No. 05-1297-T-An at 5 (internal citations omitted). In the present case, Marshall has presented no other evidence that would give rise to such a connection between his alleged speech and his termination.[2] In Cunningham, the court held in favor of the plaintiff primarily because it determined that much of the defendants' testimony was "unworthy of belief." Id. at 7 (internal citation omitted). In this case, the mere disagreement between Scott and Crawford does not give rise to a lack of credibility on the part of Scott, such that he is totally unworthy of belief. Thus, Cunningham, like Allen, does not support Plaintiff's impeachment theory. As a result, Marshall is unable to substantiate that theory or to offer further proof of a causal connection between action by Scott and his eventual termination from DCGH.

As Plaintiff has offered no evidence that connects Scott with his termination, the Court finds that there is no genuine factual dispute as to Scott's lack of employment authority over Plaintiff.

B. Pumphrey was the Sole Decisionmaker in Terminating Plaintiff, and Plaintiff Cannot Establish that Anyone Influenced Her Decision

Defendants also insist that "Plaintiff cannot establish a causal connection between the exercise of his First Amendment rights and his termination because the sole decisionmaker was unaware of his political speech." (D.E. No. 27-2, DCGH SJ Motion, p. 9.) "Pumphrey could not have retaliated against [Marshall] on the basis of speech of which she was unaware.. . . Without showing that Ms. Pumphrey was aware of the speech, [Plaintiff] cannot establish the requisite causation." (Id.) Pumphrey's deposition testimony on this point leaves very little room for argument (and also reinforces the fact that Scott had nothing to do with Plaintiff's termination):

Q:      During either of [the only two conversations between Scott and Pumphrey prior to

_____

[2]      Marshall has alleged, similar to the plaintiff in Cunningham, that DCGH failed to follow its disciplinary policy, which failure would be grounds for impeaching the Defendants' testimony. However, this contention fails for the reasons given in subpart B.2, infra.

Plaintiff's termination], did you and Mayor Scott have any discussions concerning Larry Marshall?

A:     No, none. . .

[. . .]

Q:     [D]id Mayor Scott make any comments to you or give you any indication that he was going to withhold any sort of county funds or put any type of pressure on you - -

A:     Absolutely none.

Q:     - - as it relates to Larry Marshall's continued employment?

A:     Absolutely not, no.

Q:     And to be clear, Larry Marshall was never discussed at [the meetings between Scott and Pumphrey]?

A:     Larry Marshall was not talked about, no.

Q:     At any time prior to his termination, did Larry Marshall discuss with you his political thoughts about Mayor Scott or any other Decatur County official?

A:     Not that I recall.

[. . .]

Q:     Did anybody discuss with you Larry Marshall's political thoughts or opinions or criticisms prior to his termination?

A:     No.

Q:     Did you make the decision to terminate Larry Marshall?

A:     Yes.

Q:     Did anybody else have any influence or involvement in the decisionmaking process to terminate Larry Marshall?

A:     No.

[. . .]

Q:      Were you the sole decisionmaker . . . in terms of terminating Larry Marshall?

A:      Yes.

[. . .]

Q:      Did Mayor Scott have any contact with you during your decisionmaking process to terminate Larry Marshall?

A:      No.

Q:      Does Mayor Scott have any role whatsoever in terms of employment decisions of the DCGH . . . ?

A:      No.

[. . .]

Q:      [D]id any county commissioners contact you regarding Larry Marshall's employment or continued employment prior to your decision to terminate him?

A:      No.

[. . .]

Q:      Was Larry Marshall terminated because of the comments he allegedly made that were critical of Mayor Scott?

A:      No.

Q:      Was he terminated for comments that he allegedly made that was [sic] critical of the Decatur County government?

A:      No.

Q:      Did any of these comments that he allegedly made that were critical of either Mayor Scott or Decatur County government play any role in your decision to terminate him?

A:      No, none.

Q:      Did Mayor Scott have any involvement with Larry Marshall's termination?

A:      No.

(D.E. No. 28, Pumphrey Deposition, pp. 82-87.) Plaintiff has offered "no evidence to rebut this testimony" (D.E. No. 27-2, DCGH SJ Motion, p. 10), instead relying on essentially the same "impeachment" theory that he claims raises a genuine issue of material fact as to Scott's involvement. Specifically, Plaintiff avers that his proof "severely impeaches Pumphrey's credibility and the reasons she gave for Plaintiff's termination," and that it "would allow the jury to infer that Scott and Pumphrey acted in concert, or in collaboration, to terminate Plaintiff's employment based on the exercise of Plaintiff's constitutional rights. Alternatively, it would allow the trier of fact to infer that Pumphrey alone terminated Plaintiff's employment due to his political speech and Pumphrey's desire to win favor with the county government." (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, pp. 2-3.) Notably absent from Plaintiff's response is any direct or circumstantial evidence contradicting Pumphrey's quoted testimony. Plaintiff, however, levels no fewer than nine different attacks on Pumphrey's credibility, which he contends result in the wholesale "impeachment" of her deposition testimony. (Id. at pp. 3-13.)

      1. <u>Pumphrey's Motive to Retaliate</u>

      Although it is not entirely clear from Marshall's response, it appears that he avers Pumphrey desperately needed "to stay in the good graces of Mayor Scott," due to the fact that Pumphrey wanted to build a new hospital in Decatur County. (Id. at pp. 3-4.) The Court declines to speculate further as to Plaintiff's specific contention in this regard, but it notes that even if he were correct about Pumphrey's financial motivations to stay in Scott's "good graces," he nevertheless has offered no evidence that contradicts Pumphrey's direct assertions that she had

no knowledge of Plaintiff's alleged political speech.[3] In the absence of such evidence, no reasonable juror could conclude that Plaintiff was motivated by fear of fiscal retribution when she decided to terminate Marshall. Without the knowledge that Marshall had said something about which Scott would be displeased, Pumphrey would have had no reason to think that terminating him would evoke any sort of reaction from Scott. In any event, this contention fails because it is vague and lacks evidentiary support.

    2. <u>DCGH's Failure to Follow its Progressive Discipline Policy</u>

Plaintiff makes much of the fact that the DCGH employee handbook demarcates a Progressive Discipline Policy, (the "Policy") which DCGH says "enables [it] to endeavor to act in a fair and consistent way" when taking disciplinary action. (D.E. No. 28, DCGH Employee Handbook – Appended to Pumphrey Deposition – p. 41.) The Policy outlines four levels of discipline, each escalating in severity, that comprise the "normal" disciplinary process: (1) verbal correction, (2) written correction, (3) suspension without pay, and (4) termination. (<u>Id</u>.) Marshall has claimed, citing Pumphrey's deposition, that DCGH did not follow its own policy with respect to him—that he never received verbal or written correction or a suspension without pay prior to his termination—and neither Defendant disputes these assertions. (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, pp. 4-7.)

Marshall references a number of decisions for the proposition that an employer's failure to follow a compulsory disciplinary policy is a legitimate ground for treating the employer's stated justifications for termination as mere pretext. *See, e.g.,* <u>Collins v. U.S. Playing Card Co.</u>, 466 F. Supp. 2d 954, 970-71 (S.D. Ohio, 2006) (citing <u>DeBoer v. Musashi Auto Parts, Inc.</u>, 124 F. App'x 387, 394 (6th Cir. 2005) and <u>Skalka v. Fernald Environmental Restoration Mgmt.</u>

---

[3]    Plaintiff also asserts that some of his political speech was made to Pumphrey. Pumphrey, in her deposition

<u>Corp.</u>, 178 F.3d 414, 421-22 (6th Cir. 1999) ("An employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext")). However, DCGH *did* follow its Policy as to Marshall, because the Policy explicitly permitted and contemplated DCGH's actions with regard to him. Plaintiff's argument mischaracterizes the Policy. At least twice, it makes clear that the steps outlined therein are neither a prerequisite to termination, nor must they be followed sequentially—or at all—in every instance:

> Normal steps in the disciplinary process are outlined below. However, based on the seriousness of the offense, *management may enter into any level of disciplinary action or termination*.

(D.E. No. 28, DCGH Employee Handbook – Appended to Pumphrey Deposition – p. 41) (emphasis added).

> Management reserves the right to enter into *any level of disciplinary action or termination* based upon the severity of the offense requiring discipline and the employee's past work record.

(<u>Id</u>. at p. 42) (emphasis added). As these passages make clear, the Policy anticipates that it will not be followed literally in every instance. Indeed, as the above language demonstrates, the Policy explicitly authorizes termination in certain circumstances without any prior warning. (<u>Id</u>.) Thus, Plaintiff's contentions to the contrary are without merit.

    3. <u>Plaintiff's Claim that his Separation Notice "Is Impeached" by Past Performance Evaluations</u>

Next, Plaintiff argues that his past performance reviews belie one of the bases given for his termination: poor long-term performance. Specifically, he contends that the complete absence of prior poor performance reviews "impeaches" the possibility that he was fired for such a reason. (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 7.) Although not explicit from his argument, Plaintiff ostensibly is claiming that this "discrepancy" demonstrates that his firing

---

disputes this, and Plaintiff has offered no further evidence to substantiate this claim.

for "long-term poor performance" was pretextual. As with other aspects of Plaintiff's response, however, the Court declines to speculate as to Plaintiff's unexpressed contentions. Moreover, the Court notes that although the Separation Notice mentions only "long term poor performance" as the reason for Plaintiff's termination, it appears that he was given other explanations for his termination, as demonstrated by the Minutes from the meeting in which he was terminated, and as discussed further *infra*. (D.E. No. 28, Separation Notice and Meeting Minutes – Appended to Pumphrey Deposition.) The Court also notes that as Plaintiff was an at-will employee, the stated reasons for his termination are of no moment, provided that there is no evidence of discriminatory intent. *See* <u>Mayberry v. Endocrinology-Diabetes Associates</u>, 926 F. Supp. 1315, 1323-24 (M.D. Tenn. 1996) (citing <u>Wrenn v. Gould</u>, 808 F.2d 493, 502 (6th Cir. 1987) ("an employee's subjective perception that she has suffered discrimination, in the absence of objective evidence substantiating such perception, does not constitute probative evidence of such discrimination.. . ." Employers are not required to "make fair or accurate assessments of employees' abilities . . . absent discriminatory intent or impact")).

Marshall's argument with respect to his prior performance evaluations is that he disagrees with Pumphrey's assessment: "In essence, Plaintiff argues that his conduct did not warrant his discharge." (D.E. No. 37, DCGH Reply, p. 5.) Plaintiff's prior performance reviews are not the smoking gun that he imagines them to be. Even accepting as true the contention that Marshall's prior performance reviews indicate no problems, DCGH has offered other reasons upon which it based its decision to terminate Plaintiff, many of which appear to have come to light for the first time shortly before his termination—such as the high number of deficiencies on the state audit; the Employee Satisfaction Survey, which indicated that Plaintiff had lost credibility with the hospital staff; and the fact that some of the EMS workers were not timely in filling out necessary

17

reports. Therefore, the Separation Notice itself does not represent the sum total of DCGH's proffered justifications. Plaintiff is unable to dispute any of these proffered bases for his termination. Thus, this discrepancy—such as it is—between Plaintiff's Separation Notice and his prior performance reviews is unavailing.

4. Pumphrey's Testimony Regarding State Audits "Is Impeached" by Myracle

One of the additional reasons that Pumphrey submitted to substantiate Plaintiff's termination was long-term problems with state regulatory audits of the DCGH EMS. (D.E. No. 28, Pumphrey Deposition, p. 20.) Marshall finds fault with this conclusion, pointing to the deposition of the state auditor, Teddy Myracle ("Myracle"). In pertinent part Myracle said that Plaintiff was "as good as any other EMS director"; that DCGH had a very good ambulance service; and that he, Myracle, found deficiencies in almost every audit he did, many of which were unavoidable. (D.E. No. 28, Myracle Deposition, pp. 18-38, 83-86.) The quoted testimony from Myracle does nothing to contradict DCGH's assertion that there were long-term problems with the state audits; if anything, Myracle's testimony reinforces that fact. Plaintiff instead appears to be claiming that under his leadership, the EMS at DCGH was "no worse than anybody else's." This, however, is no answer to the Hospital's admittedly truthful assessment that there were long-term problems with state audits. It is, indeed, difficult to find fault with DCGH's attempt to lower its EMS deficiency rate, despite the fact that such rate may have been comparable to that of other hospitals. Simply stating that the EMS under Plaintiff's leadership was "just as good" as any other deficient EMS is hardly a ringing endorsement of his job performance. The mere fact that such deficiencies may be commonplace in the industry has no bearing whatsoever on the legitimacy of DCGH's desire to rid itself of them. As a result, this contention is without merit.

5. <u>Myracle Impeached Pumphrey's Testimony Regarding a Hearing</u>

Another of DCGH's stated reasons for terminating Plaintiff was that under his

management, the DCGH EMS had developed poor relationships with state regulatory agencies.

(D.E. No. 28, Pumphrey Deposition, pp. 39-44.) Specifically, Pumphrey testified that Myracle

"informed [her] that [she] had a very serious problem . . . within the EMS." (<u>Id</u>. p. 39.) She

testified that Myracle and Crawford (Pumphrey's predecessor) had discussed a situation of

"fraudulent documentation" within the EMS, and that they had been "unable to impress upon Mr.

Marshall the seriousness of that, and it was going on for a period of time." (<u>Id</u>. at p. 40.)

Apparently DCGH EMS workers were not timely in filling out required reports, which was the

impetus for the concern over the "fraudulent documentation." (<u>Id</u>. at pp. 40-41.) Pumphrey

further testified that Myracle expressed frustration at DCGH's continued noncompliance with its

own quality assurance program,

> to the point where [Myracle] was talking to – this is what he said – he was
> talking to the Nashville office, sharing his frustrations at not getting us to
> comply, and that they had suggested to him that he invite DCGH EMS to
> Nashville to a hearing so that we could explain to the licensing board why we
> were noncompliant over a long period of time.

(<u>Id</u>. at pp. 43-44.) Referring to this very last point, Pumphrey stated that she was not entirely sure

when this conversation about a Nashville hearing occurred: "I don't recall if it was in that

meeting or another time that he came by…" (<u>Id</u>. at p. 43.)

Myracle, in his deposition, stated that he believed the conversation about a possible

Nashville hearing to have occurred subsequent to Marshall's termination. (D.E. No. 28, Myracle

Deposition, pp. 58-59.) Plaintiff points to this as additional evidence to "impeach" Pumphrey's

testimony, arguing that this potential Nashville hearing "could <u>not</u> have been a reason for

Plaintiff's termination." (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 9 (emphasis

in original.)) Plaintiff, however, appears to be manufacturing controversy where none exists. Pumphrey admitted that she was unsure of the date of the conversation in which a Nashville hearing was discussed, and moreover, she never explicitly said that it influenced her decision to terminate Marshall. In fact, she first mentioned the hearing in response to the question, "Is there anything else that you can think of that you believe would be evidence of poor relationships between Mr. Marshall and state/regulatory agencies?" Nothing about this question or her answer thereto indicates that Pumphrey was offering this as a specific justification for Plaintiff's termination. Indeed, Pumphrey's testimony about the Nashville hearing was simply responsive to the question asked. Furthermore, even if the conversation did occur after Plaintiff's termination (which Pumphrey acknowledged was a possibility), there is no reason to suspect that the effects of his poor job performance would not continue to be felt in his absence. As a result, even accepting Myracle's testimony on the subject of the hearing as true, Pumphrey's testimony is not inconsistent with his.

Notwithstanding the foregoing, even if Pumphrey's testimony *were* directly inconsistent with Myracle's, and even if such inconsistency created the sort of logical fallacy that Plaintiff claims it did, Pumphrey, in her deposition, pointed to several other matters to substantiate her claim that the DCGH EMS, under Plaintiff's leadership, had a poor relationship with state/regulatory agencies—such as the "fraudulent documentation" that was occurring when DCGH EMS workers filled out late reports, and Myracle's apparent frustration with the DCGH EMS's failure to follow its quality assurance plan. (D.E. No. 28, Pumphrey Deposition, pp. 39-44.) Therefore, even if the Court were to excise the allegedly offending portion of Pumphrey's testimony, she nevertheless has provided adequate alternative justifications to support DCGH's claim that Plaintiff's relationship with state regulators was deficient. Thus, Plaintiff's

highlighting of this "discrepancy" between Pumphrey's and Myracle's testimony is of no

assistance to him.

      6. <u>Plaintiff's Loss of Respect Among DCGH Employees</u>

      Plaintiff next takes issue with Pumphrey's testimony concerning his loss of credibility

among the "EMS staff, hospital staff, and the community." (D.E. No. 28, Pumphrey Deposition,

pp. 54-55.) Specifically, Pumphrey claimed that several people—"four or five folks"—expressed

concerns to Pumphrey about Marshall's leadership of the EMS "off and on over a period of

time." (<u>Id</u>. at p. 56.) When asked to recount specifically what she had heard, Pumphrey said:

> That it was difficult to work with EMS from Air Evac; that it was difficult to
> work with the EMS staff and the hospital; there were rubs sometimes with
> having the EMS staff come over and either suicide watch or help out in ER;
> and the EMS was really positioned as a separate entity across the street, with
> no ties to the hospital. That was the perception.

(<u>Id</u>. p. 55.) Pumphrey also mentioned the Employee Satisfaction Survey that she was given upon

assuming the position of DCGH Administrator, which indicated that Plaintiff had "lost total

credibility within the department and Hospital-wide," and that the "employees ha[d] little respect

for his authority and leadership." (<u>Id</u>. pp. 55-56; D.E. No. 28, Employee Satisfaction Survey –

Appended to Pumphrey Deposition – p. 1.) However, when asked to name one of the "four or

five" individuals who had expressed concerns about Plaintiff's leadership or abilities, Pumphrey

was unable to do so, because "there were comments that were being made that I really wasn't

taking to heart to listen to and attach a name to it. It was more a comment of how to work with or

how they've interfaced with EMS in the past. And that's where I got my conclusions." (D.E. No.

28, Pumphrey Deposition, at p. 56.) As a result, Plaintiff disputes the credibility of this

testimony, stating that "Pumphrey claims she received complaints regarding Plaintiff that were

so serious they warranted termination, but they were not serious enough for her to take note of their names." (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 10.)

The Court notes that although Marshall does not raise any particular objection to this section of Pumphrey's testimony—Plaintiff's response merely mentions this section of the deposition to demonstrate that Pumphrey was vague on this point—the issue Plaintiff raises in this regard has little bearing on the determination of summary judgment because this dispute neither proves causation, nor "impeaches" Pumphrey's testimony. That is, even accepting as true Plaintiff's contention that Pumphrey's testimony was vague, his objections to the testimony demonstrate neither that it was untrue or inaccurate, nor that Pumphrey terminated Plaintiff due to his allegedly protected speech. Even were the Court to agree with Plaintiff that Pumphrey's testimony was ambiguous—and thus, less credible—it would make little difference in the ultimate determination of whether to award summary judgment. Therefore, as this contention does not alter the summary judgment calculus, no further discussion of it is necessary.

      7. <u>The State Audit</u>

The parties stipulate that Pumphrey told Marshall, at the time of his termination, that one of the reasons he was being terminated was that he had "failed a state audit." (D.E. No. 27, DCGH Statement of Undisputed Facts, ¶ 60; D.E. No. 28, Marshall Deposition, p. 56.) Plaintiff, however, citing Myracle's deposition, avers that there are no actual "failing" grades on such audits. (D.E. No. 28, Myracle Deposition, p. 83.) As a result, Plaintiff contends that DCGH subsequently has attempted to "change course," claiming instead that the high number of audit deficiencies was one of the reasons for Plaintiff's termination. (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 10.) Plaintiff further notes that "virtually all audits result in some

deficiency findings," apparently in an attempt to dispute the legitimacy of this particular ground for termination. (Id.)

Marshall's objection as to how DCGH can be said to have "change[d] course" with respect to the state audit—when DCGH initially cited Plaintiff's "failure" of the audit and subsequently referred to the audit as containing a high number of deficiencies—is unavailing. Plaintiff apparently asserts that there is a measurable distinction between a "failure" of an audit and a "high number of deficiencies" in an audit. This is a distinction without a difference. Such a discrepancy, if it exists, is primarily a matter of semantics and does not represent any markedly different contention by DCGH. Accepting without deciding that Myracle's testimony was accurate—insofar as "failure" of such an audit is not possible—Plaintiff nevertheless has not rebutted DCGH's claim that there were many deficiencies, opting instead to assert, once again, that because all audits contain them, these deficiencies could not have created a legitimate ground for termination. However, as the Court has stated repeatedly, the mere fact that other hospitals are willing to accept deficiencies does not obligate DCGH to do likewise. For many of the same reasons given in subpart B.6, *supra*, this contention, even if supported by the facts, would be of little avail to Plaintiff, given that it neither impeaches Pumphrey's testimony nor provides evidence of a causal link between Plaintiff's alleged speech and his termination.

8. Loss of Credibility in the Community

Plaintiff, in his responses to Defendants' motions, emphasizes the fact that DCGH originally listed as one of the reasons for Plaintiff's termination, "Credibility w/EMS staff, hospital staff *& the community* has been lost." (D.E. No. 28, Exhibit to Marshall Deposition, p. 179) (emphasis added). However, when asked during her deposition to differentiate between "hospital staff" and "the community," Pumphrey stated that both were meant to be references to

people associated with the hospital, and that "the community" did not mean the Parsons community at large. (D.E. No. 28, Pumphrey Deposition, pp. 53-54.) Plaintiff ascribes a great deal of significance to this, arguing that Pumphrey changed her story at her deposition; that is, that Pumphrey realized that the original notation ("Credibility w/EMS staff, hospital staff & the community has been lost") supported Plaintiff's claim that he was fired for political reasons, and so she changed her story to cover up that fact. (D.E. No. 31, Response to DCGH SJ Motion, pp. 11-12.) In other words, Plaintiff argues that Pumphrey's invocation of "the community" at the time of his termination was a tacit admission that Plaintiff's political criticisms were creating political problems for DCGH, and that Pumphrey's subsequent equivocation on this point is evidence of an attempt to cover up her previous wrongdoing. (Id.)

The Court notes at the outset that the passage at issue is grammatically ambiguous. Given the fact that there is no comma between "hospital staff" and "& the community," Plaintiff's interpretation of the passage is but one alternative among other possibilities—it is equally plausible to interpret "hospital staff & the community" as referring to a single, all-inclusive group of hospital-related employees, as opposed to two discrete groups of people. But even were it not so, neither Pumphrey's deposition statements nor the other facts of this case bear out Plaintiff's interpretation of this language as an attempted cover-up. At best, it appears Plaintiff can claim only that Pumphrey should have chosen her words more carefully during the meeting in which she terminated Plaintiff. Without more, the controversy over her chosen language is not as significant as Plaintiff contends. Marshall has offered no other evidence to substantiate his claim that the combination of the ambiguous passage and Pumphrey's subsequent testimony on the same represent a cover-up attempt. As a result, even when viewing all evidence in the light

24

most favorable to Plaintiff, a reasonable jury could not extrapolate from this passage the subtext that Plaintiff now attempts to attribute to it.

       9. <u>The Number of Reasons Given</u>

       Finally, Marshall claims that "the number of reasons given" by DCGH should evoke suspicion. (D.E. No. 31, Plaintiff's Response to DCGH SJ Motion, p. 13.) However, Plaintiff does not specify the reasons to which he is referring, or in what ways or why these "reasons" ought to be viewed with suspicion. The extent of Plaintiff's argument in this regard is a two-sentence citation to <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799 (6th Cir. 1998). Once again, the Court declines the invitation to speculate as to the true meaning of Plaintiff's unexpressed contentions. However, to the extent that he is attempting to claim that the multitude of justifications for his termination demonstrates evidence of pretext, the Court rejects this contention as unsupported by either <u>Smith</u> or logic.

      <u>Smith</u> is factually different from the instant case. Smith was an electrician for Chrysler Corporation who was fired for failing to disclose on his medical forms that he suffered from a "narcoleptic-like" sleeping disorder. <u>Smith</u>, 155 F.3d at 801. He sued Chrysler, alleging that the given reasons for his termination were pretextual—designed to disguise the discrimination of which he was a victim, in violation of the Americans with Disabilities Act. <u>Id</u>. Chrysler prevailed, largely upon its showing that it had an "honest belief" that Smith had been untruthful—that is, Chrysler possessed good-faith, nondiscriminatory motives for terminating the employee—even though one of those honestly held beliefs turned out to be erroneous. <u>Id</u>. In discussing the "honest belief" rule, the Sixth Circuit cautioned that employers must take care to justify such an "honest belief" with particularized factual evidence, and that merely positing

several alternative theories of relief would be unavailing unless specifically tied to the particular

subject of the "honest belief." The relevant paragraph from <u>Smith</u>, to which Plaintiff cites, states:

> [W]e wish to point out that an employer's strategy of simply tossing out a
> number of reasons to support its employment action in the hope that one of
> them will "stick" could easily backfire. "There may be cases in which the
> multiple grounds offered by the defendant for the adverse action of which the
> plaintiff complains are so intertwined, or the pretextual character of one of
> them so fishy and suspicious, that the plaintiff could withstand summary
> judgment." <u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 70 (7th Cir. 1995). Thus a
> multitude of suspicious explanations may itself suggest that the employer's
> investigatory process was so questionable that any application of the "honest
> belief" rule is inappropriate.

<u>Id</u>. at 809.

This language is of no assistance to Plaintiff. Aside from the fact that <u>Smith</u> is factually

distinguishable from Marshall's case, there is no indication that the Sixth Circuit intended the

language above to be extended beyond the "honest belief"[4] defense; that is, when read in the

context of the entire opinion, the above language is part of a discussion about the "honest belief"

rule specifically, and is not, as Plaintiff apparently asserts, a statement of broader significance

about the perils of justifying adverse employment actions. Furthermore, the Sixth

Circuit does not appear to have extended the "honest belief" rule beyond cases of employment

discrimination—as opposed to Marshall's claim, which is one of First Amendment retaliation.

<u>Id</u>. at 806-07 (defining "honest belief" rule in employment discrimination context); *see also* <u>Gant</u>

<u>v. Genco I, Inc.</u>, 274 F. App'x 429, 436 (6th Cir. 2008) (citing <u>Smith</u> and analyzing "honest

belief" rule in the context of alleged race discrimination), <u>Martin v. Toledo Cardiology</u>

<u>Consultants, Inc.</u>, 548 F.3d 405, 414 (6th Cir. 2008) (discussing applicability of "honest belief"

rule in the case of alleged age discrimination), and <u>Clay v. United Parcel Service, Inc.</u>, 501 F.3d

---

[4]     The <u>Smith</u> court articulated the rationale behind the "honest belief" rule thus: "If the employer honestly,
albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then
the employer arguably lacks the necessary discriminatory intent." <u>Smith</u>, 155 F.3d at 806.

695, 713-14 (6th Cir. 2007) (discussing application of "honest belief" rule in case of alleged race discrimination). However, even if this were an instance in which the "honest belief" rule applied, all of the evidence indicates that DCGH did have such a genuinely held, "honest belief" in the veracity of its reasons for terminating Marshall. Also unlike the plaintiff in Smith, Marshall has not demonstrated that any of DCGH's honestly held beliefs were erroneous.

Furthermore, the above passage from Smith contemplates a multitude of *suspicious* explanations proffered by the employer, or at least that the employee is able to "cast[] substantial doubt on many of the employer's multiple reasons." Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 814 (10th Cir. 2000); Smith, 155 F.3d at 809. DCGH's proffered bases for terminating Marshall do not have a facially suspicious character, nor do they create the impression that DCGH was merely throwing out several reasons hoping that one would "stick." Instead, the evidence amply demonstrates that, far from being suspicious or pretextual, DCGH's reasons for terminating Plaintiff were well-grounded in the facts available to it. The mere fact that DCGH was able to offer multiple valid reasons to justify its decision to terminate Plaintiff, rather than evoking suspicion, instead has the opposite effect, convincing the Court that DCGH's actions were neither discriminatory, nor unwarranted. Otherwise, it strains credulity to think that an employer should be viewed with suspicion merely for terminating an employee in the face of overwhelming evidence that it would be justified in doing so. *See, e.g.,* Parikh v. Cleveland Hardware and Forging Co., 2006 WL 1515667 (N.D. Ohio May 26, 2006) (after thoroughly analyzing each of employer's numerous proffered justifications for terminating employee, court found employee had failed to carry his burden of demonstrating that the justifications were pretextual or insufficient).

C. Plaintiff was Terminated Because of His Poor Job Performance, His Alleged Political Comments Notwithstanding

As established above, the evidence demonstrates that Plaintiff has failed to establish a causal link between his alleged speech and his termination. Thus, his prima facie case for his First Amendment retaliation claim fails. Because of, *inter alia*, the audit deficiencies, the results of the Employee Satisfaction Survey, and Plaintiff's apparent inability to controvert the proffered reasons for his termination, the Court finds that there is no need to entertain a discussion of pretext. The Court concludes that the evidence supports the legitimacy of DCGH's decision to terminate him.

As a result, Defendants successfully have established that there is no genuine issue as to any material fact, and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Because Plaintiff has failed to establish that the City has deprived him of any constitutional right, his claim against the City under Section 1983 must fail. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003), as must his claim against Scott as an individual, pursuant to Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *as modified by* Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Therefore, the Court GRANTS both Defendants' Motions for Summary Judgment as to the Plaintiff's First Amendment retaliation claim.

Having disposed of Marshall's allegations under federal law, the Court now turns to his remaining state law claim against Scott: intentional interference with the employment relationship. The exercise by a district court of supplemental, or pendent, jurisdiction over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it had original jurisdiction.

28 U.S.C. § 1367(c)(3). Absent any remaining federal claims against the Defendants, the Court, in its sound discretion, hereby DISMISSES WITHOUT PREJUDICE the Plaintiff's remaining state law claim. *See* <u>Weeks v. Portage County Exec. Offices</u>, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

CONCLUSION

For the reasons stated herein, the Court **GRANTS** both Defendants' Summary Judgment Motions as to Plaintiff's First Amendment retaliation claim and **DISMISSES WITHOUT PREJUDICE** Plaintiff's remaining state law claim.

**IT IS SO ORDERED** this, the 26th day of February, 2010.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE